[CHAMBERSBURG, NOVEMBER 1, 1828.]

## CLARK *against* CAMPBELL and WILLIAMSON.

### IN ERROR.

Testator devised to his wife, during her life time, or widowhood, all his estate, real and personal, to be applied by her towards raising and schooling his children, and at her decease, the remainder, if any, to be divided according to the laws of this commonwealth, share and share alike: and in case she should see cause to marry, she was to have only her bedding, and an equal share with the children that might then be living, out of his estate, and the remaining executor, or guardians of the children to take care of their parts. He then appointed his wife and another executors, empowering them to sell the tract of land in dispute, and the money that might be got for it to be laid out on other property, or to the best advantage, except what might be necessary for keeping, schooling, and raising the children, until they were empowered to call for it, agreeably to the former part of the will. The wife survived the other executor, and married. *Held,* 1. That she and her husband had no power to sell. 2. That after the children had arrived at full age, the power, even if the other executor had been living, ceased.

A purchaser at sheriff's sale is not affected by any secret transfer by the defendant, by parol, previous to the judgment, particularly if the defendant was then in possession.

WRIT of error to the Court of Common Pleas of *Cumberland* county, in an action of ejectment, in which the plaintiff in error was plaintiff below, and claimed two undivided sixth parts of a tract of land.

The facts material to the case appearing in evidence on the trial, were as follow:—

*Robert Coffee* being seised of the whole tract in question, died about the year 1800, leaving a widow and five children, having duly made his last will, as follows:—

"I give unto my beloved wife, *Nancy*, during her life time, or widowhood, all my estate, real or personal, to be by her applied towards raising and schooling my children, and at her decease, the remainder, if any, to be divided according to the laws of this commonwealth, share and share alike. And, in case she should see cause to marry, she is to have only her bedding, and an equal share with the children that may then be living, out of my estate; and the remaining executor or guardians of the children, to take care of their parts. And I do hereby constitute and appoint my loving

(Clark *v.* Campbell and Williamson.)

wife, *Nancy*, and my trusty friend, *John Reynolds*, as executors to this, my last will and testament, hereby empowering them, if they think fit, and get what they judge a sufficient price for it, to sell and convey a small tract of land, (the tract in question,) belonging to me in *Southampton* township, *Cumberland* county, adjoining my brother, *Thomas Coffee, John M'Lain*, and others, containing near one hundred acres, be the same more or less, hereby giving them, or the survivor of them, full power to sell and convey, and to make, execute, sign, seal, and deliver a conveyance, or conveyances, for the same, in as full and ample a manner as I could do were I living, and present. And the money that may be got for it to be laid out on other property, or to the best advantage, except what may be necessary for keeping, schooling, and raising the children, until they are empowered to call for it, agreeably to the former part of this."

*Nancy*, the widow, intermarried with *M'Knight*, in 1805. *John Reynolds*, the co-executor, died in 1814. It appeared, that *M'Knight*, on his marriage, took possession of the land; and during the infancy of the children, and down to the year 1817, held the whole, or greater part of it. *Thomas* and *John*, two of the sons of the testator, after they came of age, appear to have been in possession of a part for a number of years; and, at one time, the land was rented, and the rent, as the witness said, payable to the heirs. It was sworn, that *Thomas* sold, by parol, his interest under the will, to *M'Knight*, in 1806, for two horses, which he received; and, that *John* also, by parol, sold to *M'Knight* his interest, for one hundred and fifty dollars, which he received. A receipt was also produced, signed by *John*, and given to *M'Knight*, dated the 15th of *April*, 1818, for four hundred dollars, "*for my share and a half* (he had purchased a half share,) *in the estate of my late father.*" On the other hand, it was sworn, that in 1821, by the unanimous consent of the heirs, (except an infant child of *Robert*, who had died,) a partition was made of the property by a surveyor, employed for the purpose, into six shares, divided by metes and bounds, and that *Thomas* and *John* drew their shares by lot with the rest. Mrs. *M'Knight*, the mother, also, drew her share. Mrs. *M'Knight* objected; for what reason is not stated; and the partition appears to have been abandoned. The youngest child of the testator came of age in 1819. In *March*, 1822, *M'Knight*, together with his wife, the executrix, under the alleged power in the will, by deed, reciting a consideration in money, and recorded in *July* following, sold and conveyed, in fee simple, the whole tract to *Williamson*, the defendant.

*Clark*, the plaintiff in the ejectment, derived his claim as follows:—In *April*, 1819, the executors of *John Krisher*, obtained a judgment by confession, before a justice of the peace, against *Thomas* and *John Coffee*, two of the sons of the testator, for four hundred and fifty-eight dollars. A transcript of this judgment being

(Clark *v.* Campbell and Williamson.)

filed in the prothonotary's office in *May*, 1820, after sundry executions, and a levy upon the interest of *Thomas* and *John* in the land in question, a sheriff's deed was, in due form, made to *Clark*, the plaintiff, for the two undivided sixth parts of *Thomas* and *John*.

The plaintiff, on the trial, presented sundry points of law to the court. None of them, except the *fourth*, is material. The answers to the rest were not complained of. The *fourth* point was: "That if the children were all of age, several years before the alleged sale to *Williamson*, and all married, and all necessity of schooling, raising, and supporting them, had long ceased, and the widow was married in 1805, then the widow and her husband had no power to sell the land at all in 1822."

The court charged the jury: "The plaintiff purchased at sheriff's sale the alleged estate of *John* and *Thomas Coffee* in the tract of land of their father, as described in his will; and this ejectment is brought to recover the possession. Suppose the suit was by *Thomas* and *John Coffee* against the defendant, could they recover? Old *Robert Coffee*, the father of *John* and *Thomas*, owned the land. He made his will, and appointed his wife executrix, with *J. Reynolds*, executor. *Reynolds* soon after died. In that will, the widow, as surviving executrix, had power to sell the land referred to, and the proceeds were directed to be appropriated in a particular way. What did *Thomas* and *John* take under the will? The legal estate, by the operation of the will, and the act of assembly of 1792, was vested in the executors. They had a right to take possession of it, and a right to sell. *Thomas* and *John* either were to take a legacy, in money, out of the proceeds of the sale, or at most, had an equitable interest in the land. If the executors had denied the trust, or refused to execute it, they might have been compelled by ejectment. But if they have not denied the trust, nor refused to execute it, I cannot see how an ejectment could be sustained against them. The law gave them the right to possession, and the legatees, as such, could not deprive them of it. There was a discretion vested in the executors, or survivor, as to the sale, and price, by the will. The power to sell is not limited to the period of the infancy of the children, as contended for by the plaintiff's counsel, and a sale was actually made by the executors to *D. Williamson*, and the deed recorded before the sale by the sheriff to Mr. *Clark*. It might operate most unjustly if the plaintiff's construction were given to the will. Suppose the facts to be as *John Coffee*, (a witness,) stated, that *Thomas* did actually sell out his share to *M'Knight*, who had married the executrix, and that *John Coffee* did sell out his also, and both did actually receive, in money, the whole amount of their interest, from the husband of the surviving executrix, long before the judgment on which the sale to the plaintiff was made. If such were the facts, in connexion with the sale, as stated, I cannot see how the plaintiff can recover in this suit. As to the *fourth* point

(Clark *v.* Campbell and Williamson.)

proposed, we cannot answer in the affirmative: We refer to the remarks made before taking up the points, as a fuller answer to this proposition."

In the charge of the court to the jury, three errors were now assigned, viz.

1. That the executors of *R. Coffee* were entitled to the possession of the land, and could not be deprived of it by the heirs, and the plaintiff could not recover.

2. That the power to sell was not limited to the infancy of the children; and in refusing to answer the plaintiff's fourth point in the affirmative.

3. That if *T.* and *J. Coffee* sold their interest to *M'Knight,* who married the executrix, and received the price before the judgment and the sheriff's sale, and if the executors sold to *Williamson,* whose deed was recorded, the plaintiff could not recover, without any reserve as to the possession, clearing, &c., or want of notice to *Krisher's* executors, or *Clark,* of the parol sale, &c.

*S. Alexander,* for the plaintiff in error, argued, that no power to sell was given to the executrix and her husband: and that if the power did once exist, it ceased on the extinction of the object of the sale by the coming of age of all the children. In either case, the shares of the children were real estate, bound by judgment, and recoverable by ejectment. The intent of the will is manifest. Instead of a power left to the widow by a future marriage to transfer to a second husband the disposal of the children's property, the plainest implication is, that after a second marriage she was no longer to be even executrix; for, while she should continue executrix, *Reynolds* could not, with any sense at all, be called, as he is in the will, *the remaining executor,* We are to take the whole will together; also to give to every part a reasonable meaning if possible, which it is apprehended would not be the case here, if by construction only, there can be made out a design in the testator to take from the widow the care of the most trifling personal property, because of her second husband, and yet to give to that same second husband the entire disposal, not only of the personal effects, but of all the land in fee simple. But even *Reynolds* himself, the executor, had he lived, would have had no power to sell after the children had attained their age. The object of the power was ended, and therefore the power itself was at an end. *Dailey* v. *James,* 8 *Wheat.* 531. *Ellsworth's Lessee* v. *Jansen,* 6 *Johns. Rep.* 73. *Lessee of Smith* v. *Folwell,* 1 *Binn.* 558. The case of *Ellsworth's Lessee* v. *Jansen,* was similar to this in most respects, except that the implication was not so strong as in this. It was a case, not of a public, but a private sale, like the present: It was a case of a sale to a relation, a son-in-law of the executor; here the sale was to a brother-in-law. But there is another point. Here was an election and agreement to take the land itself, carried into effect by a partition completed by metes and bounds: an election

(Clark *v.* Campbell and Williamson.)

and agreement which *Thomas* and *John Coffee*, after their rights have become vested in their creditors, cannot be permitted to retract. The alleged parol sales to *M'Knight*, it is believed, were by the statute of frauds merely null and void; particularly under the circumstances of this case, the witness testifying to the parol sales being brought to disprove his own title, after a transfer by the law to another, contradicting his own previous acts, having for a long time after the supposed sale, held the land, or a part of it, in his own possession, as his own property, and not as a tenant; and having so late as 1821 made an actual partition and drawn lots for his share; while the previous possession, whatever it was, of *M'Knight* can be, and by the settled rules of law ought to be, referred to his assumed power as guardian, and to his ownership of an undivided share in right of his wife. *Billington* v. *Welsh*, 5 *Binn.* 129. *Withers's Appeal*, 14 *Serg. & Rawle*, 185.

*Williamson* and *Carothers*, *contra*.—If the facts are well considered, we apprehend there can be no doubt of the law. *M'Knight* held possession of the land up to 1817. The two sons came in by renting, not by any election. There can be no stronger disaffirmance of title, than by their possession as tenants paying rent. In 1821, *M'Knight* again came in and held the land until the sale to *Williamson*. That meaning of the will which is said to be so clear is not visible to us. The beneficial interest intended for the widow is given in one part. In another part, altogether unconnected, is the power to sell, granted to her as executrix—" *Hereby giving them, or the survivor of them, full power,*" &c. Words cannot be more express. In the will there is no limitation of the power to the time in which schooling, &c. would be necessary; and the law fixes no limitation. It is said, here is a limitation by intendment. If so, it must be a forced intendment. The circumstances, even if the words of the will were doubtful, would go far to explain the intent of the testator. The children all young, the impossibility of all coming of age at the same time, and the consequent impossibility of each taking his share at twenty-one, unless he was to take it in money, the obvious difficulty of making a title from various future accidents, unless prevented by a power in the will, altogether seem to make it next to impossible that the testator could have meant to provide for his children by leaving each of them seventeen acres of poor land. Here was not a naked power. It was an interest in the executors. The provisions of the acts of assembly, *Purd. Dig.* 277, are conclusive upon this point. There is not even a resulting trust left to the heirs. Their remedy could never be by ejectment. *Henderson's Executor* v. *Wilson's Executors*, 13 *Serg. & Rawle*, 330. *Cook* v. *Duckenfield*, 2 *Atk.* 565, 568. *Gause* v. *Wiley*, 4 *Serg. & Rawle*, 521.

The power was well executed. If a married woman be executrix, the husband has the whole authority with or without her assent. *Toller's Law of Executors*, 412. As to notice—the will was no-

(Clark *v.* Campbell and Williamson.)

tice, vesting, as it did, the land in the executors or the survivor of them. Besides, *Williamson's* deed was recorded in *July*, and the sheriff's deed to *Clark* was not made until the *September* following. At any rate, notice to a judgment creditor is not essential. *Heister* v. *Fortner*, 2 *Binn.* 42. The partition was never agreed to by *M'Knight.* In itself it was a mere nullity, void by the statute of frauds, being by parol only, and not followed up by possession. *Ebert.* v. *Wood*, 1 *Binn.* 218. As to fraud, no fraud is directly alleged; nor can there be any probable inference of it from this record. The fact of *Williamson* having been the brother-in-law of *M'Knight* will support no such charge. Nor was the attention of the court below called to this matter at all.

The opinion of the court was delivered by

Tod, J.—I cannot say that the third assignment of error, relative to the effect of the parol sales, has been sustained by the plaintiff in error. With one exception, neither the points of law submitted to the court below, nor the answer to them, have been placed on the record. If the shares of *Thomas* and *John*, are to be considered as real estate at the time of the judgment against them, and not as a mere right to the proceeds of the money, then, clearly, by the statute of frauds the purchaser at sheriff's sale is not to be affected by any secret transfer by parol, particularly if the fact was that *Thomas* and *John* were in possession of their shares at the time of the judgment entered against them. This matter we look upon as settled by the case of *Withers's Appeal*, 14 *Serg. & Rawle*, 185. The main point in the cause then is, Had *M'Knight* and wife, under the will, a subsisting power to sell? Concurring, as I do, most fully in most of the reasoning of the court below, yet on this subject it does appear to me that in the hurry of a jury trial they have mistaken the law. I think there was no power of sale in the surviving executrix and her husband at any time. If there had been such authority in them at one time, I would think the power was ended when all the children had arrived at full age. There is no doubt of the law as laid down in *Toller's Law of Executors*, 240:—" If a married woman be an executrix, or administratrix, the husband has a joint interest with her in the effects of the deceased, such as devolves the whole administration upon him, and enables him to act in it to all purposes, with or without her assent." But, in defining the extent of a power, the words of the grant of it are to be chiefly, or rather solely regarded. If there is a general rule, without any exception applicable to last wills, it is that the declared intent of the testator shall be effectual, so far as it opposes no principle of law. To make out the intent, all the parts of the will must be taken together. " *I give unto my beloved wife, during her life time, or widowhood, all my estate, to be by her applied towards raising, &c. And, in case she should see cause to marry, she is only to have her bed and bed-*

(Clark *v.* Campbell and Williamson.)

*ding, and an equal share with the children, &c.    And the re-maining executor, or guardians of the children, to take care of their parts.*" His meaning seems to be not to trust his children to the care, nor their property to the disposal of any future hus-band of his widow.    That he intended a perpetual guardianship to be lodged in a step-father must, I think, be out of the question. Nor are these provisions of the testator to be looked upon as over-ruled and defeated by the subsequent parts of the will giving power to the executors, or the survivor of them, to sell and convey.    There is, I take it, no contradiction.    The testator seems to have provided first for the case of his wife's marrying again, and next for the case of her continuing a widow, giving her the fullest power in the lat-ter event, and no power at all in the former.    But no matter who were the executors; even if *Reynolds* himself had been living, he could not, I think, legally sell the land in 1822.    The object of the power had then ceased.    All the children had then attained full age.    Raising and schooling were then at an end: therefore, so was the power.    The decisions have been frequent on this point.    With-out any precedent, the direction in the will, *to lay out the over-plus in other property, or to the best advantage, until they* (the children) *were empowered to call for it,* would seem to show that the only sale he meant was a sale while the children, or some of them, were unable to sell for themselves; and that there was a ter-mination of the power implied in the very nature of it; just as a power to sell for payment of debts would imply that no lands are to be sold from the heirs after the debts are all paid.    To support the sale to *M'Knight,* the acts of assembly of the 12th of *March,* 1800, and 31st of *March,* 1792, have been cited.    Those acts do expressly direct that a power to sell lands shall pass to a surviving executor, or to an administrator with the will annexed, and that a naked power to sell shall be as available as a power coupled with an interest.    In my opinion these acts of assembly are misapplied to the present case.    They were formed to obviate inconveniencies, to remove doubts, and settle points of law altogether different from any that are contested here.    This case depends upon the will. Certain I am it would be a perversion of the two acts of assembly, so to construe them as to oblige a man to intrust the guardianship of his children to another, in spite of all the directions he can put into his will to the contrary.    The opinion of the court is, that the judgment be reversed, and that a *venire facias de novo* be awarded.

Judgment reversed, and a *venire facias de novo* awarded.